United States Courts
Southern District of Texas
FILED
September 23, 2026
Nathan Ochsner, Clerk of Court

Sealed
Public and unofficial staff access to this instrument are prohibited by court order

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No. 26-CR-00189** |
| | § | **UNDER SEAL** |
| **JAMES ROBLES, M.D., and** | § | |
| **RONALD LEWIS,** | § | |
| | § | |
| **Defendants.** | § | |

## SUPERSEDING INDICTMENT

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times material to this Superseding Indictment, unless otherwise specified,

1. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly and intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2. The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances" and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3. A controlled substance assigned to "Schedule II" meant that the drug had a high potential for abuse and a currently accepted medical use in treatment in the United States, or the drug had a currently accepted medical use with severe restrictions.

4. Pursuant to the CSA and its implementing regulations:

a. Oxycodone was classified as a Schedule II controlled substance. Oxycodone was used to treat moderate-to-severe pain and, as with other opioids, was highly addictive. Oxycodone HCL 30 mg ("oxycodone 30 mg") tablets were sometimes referred to as "blue," "blueberries," or "whites" depending on the manufacturer. The 30 mg pill was the strongest, short-acting pill form of the drug commercially available, and it had substantial street value and was in high demand on Houston's black market.

b. Hydrocodone was classified as a Schedule II controlled substance. Hydrocodone was used to treat moderate-to-severe pain and, as with other opioids, was highly addictive. Tablets combining 10mg of hydrocodone bitartrate and 325 mg of acetaminophen ("hydrocodone 10-325 mg") was sometimes marketed under the brand name Norco. The 10-325 mg pill was the strongest, short-acting combination-pill form of the drug commercially available, and it had substantial street value and was in high demand on Houston's black market.

c. "Potentiators," so-called because they enhanced the high from opioids like hydrocodone and oxycodone, included carisoprodol, a Schedule IV controlled substance classified as a muscle relaxant. Carisoprodol 350 mg pills had substantial street value and were in high demand on Houston's black market.

5. With exceptions not applicable here, only appropriately licensed and registered pharmacies could dispense controlled substances, and only pursuant to legitimate prescriptions filled by an appropriately licensed and registered pharmacist acting in the usual course of his or her professional practice. *See* 21 C.F.R. §§ 1306.04 and 1306.06. The issuing physician and the pharmacist who filled the prescription for a controlled substance shared a corresponding responsibility for its proper prescribing and dispensing. *See* 21 C.F.R. § 1306.04. In addition, Section 1306.04 of Title 21 of the Code of Federal Regulations instructed that:

> [a]n order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Act (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

6. In Texas, in a clinical setting, only physicians who were licensed to practice medicine were permitted to prescribe Schedule II controlled substances, including oxycodone and hydrocodone.

7. In Texas, in a clinical setting, a physician could not delegate to a non-physician the authority to issue prescriptions for Schedule II controlled substances.

8. Title 22, Section 291.29 of the Texas Administrative Code required that a "pharmacist shall make every reasonable effort to prevent inappropriate dispensing due to fraudulent, forged, invalid, or medically inappropriate prescriptions in violation of a pharmacist's corresponding responsibility."

9. A "crew leader" was someone who found and paid individuals, some of whom were homeless or impoverished, to pose as chronic pain patients ("purported patients"); transported the purported patients (often in groups) to a clinic; coached the purported patients to fill out patient intake documentation to support a prescription for pain medication and paid for the purported "visit with the doctor" (i.e., the illegitimate prescription); took the purported patients (or just the illegitimate prescription) to the pharmacy; and paid for and took control of the prescription drugs, often to divert and sell them on the street for profit.

**DEFENDANTS, A RELEVANT INDIVIDUAL, AND RELEVANT ENTITIES**

10. Defendant **JAMES ROBLES**, **M.D.** ("**ROBLES**"), a resident of Hidalgo County, Texas, was a medical doctor and purported pain management physician licensed to practice medicine in the State of Texas since in or around 1994. **ROBLES** practiced from multiple locations, including New Pain Solutions of Houston Inc., d/b/a CLINICA, a purported pain-management clinic located at 12000 Bellaire Blvd, Suite 160, Houston, Texas ("CLINICA").

11. Defendant **RONALD LEWIS** ("**LEWIS**") was a crew leader who coordinated with others to pay and "run" individuals posing as patients to purchase illegitimate prescriptions at CLINICA and other clinics, and to have the illegitimate prescriptions filled by Houston-area pharmacies, including PHARMACY A.

12. Person 1 was CLINICA's de facto manager.

13. PHARMACY A was a pharmacy located on Southwest Fwy, in Houston, Texas. PHARMACY A was licensed by the Texas State Board of Pharmacy and registered to dispense controlled substances with the Drug Enforcement Administration ("DEA"). Person 1's family member was PHARMACY A's on-paper owner; however, Person 1 controlled and oversaw day-to-day operations of PHARMACY A.

**COUNT ONE**
**Conspiracy to Unlawfully Distribute and Dispense Controlled Substances**
**(21 U.S.C. § 846)**

14. Paragraphs 1 through 13 of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

15. From in or around January 2017, and continuing through in or around October 2021, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, Defendants

**JAMES ROBLES, M.D.**, and
**RONALD LEWIS**

knowingly and intentionally combined, conspired, confederated, and agreed together and with each other, Person 1, and others known and unknown to the Grand Jury to violate Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(2), that is, to knowingly and intentionally

distribute and dispense mixtures and substances containing detectable amounts of controlled substances, including oxycodone and hydrocodone, each a Schedule II controlled substance, and carisoprodol, a Schedule IV controlled substance, knowing and intending that such distribution was unauthorized.

**Purpose of the Conspiracy**

16. It was the purpose of the conspiracy for the Defendants and others to unlawfully enrich themselves by, among other things: (a) distributing and dispensing controlled substances without a legitimate medical purpose outside the usual course of professional practice; (b) generating large profits from distributing and dispensing those controlled substances; and (c) diverting the proceeds from distributing and dispensing those controlled substances for their personal use and benefit.

**Manner and Means of the Conspiracy**

17. The manner and means by which the Defendants and others sought to accomplish the purpose and object of the conspiracy included, among other things:

18. **ROBLES** used his status as a licensed physician, his DEA Registration Number, and his medical practice CLINICA to knowingly and intentionally prescribe controlled substances, including oxycodone, hydrocodone, and carisoprodol, knowing the prescriptions were not for a legitimate medical purpose and were being issued outside the usual course of professional practice.

19. The vast majority of **ROBLES**'s prescriptions were for the highest-strength immediate-release oxycodone pill (30 mg), the highest-strength hydrocodone-acetaminophen combination pill (10-325 mg), or the highest-strength carisoprodol pill (350 mg). In addition, the

vast majority of **ROBLES**'s prescriptions for oxycodone and hydrocodone were for the same or substantially similar dosage units (100 to 120 pills).

20. **ROBLES** at times prescribed the highly addictive and dangerous combination of hydrocodone and carisoprodol, also known as the "Las Vegas Cocktail."

21. Person 1 oversaw CLINICA's day-to-day operations, including directing employees to deposit cash paid by purported patients into accounts owned or controlled by Person 1, **ROBLES**, and other co-conspirators; employed CLINICA front desk employees; set CLINICA's hours; and directed CLINICA employees not to lower the dosage amounts for controlled substances prescribed by **ROBLES**.

22. Person 1 oversaw PHARMACY A's day-to-day operations and set prices.

23. Wholesalers, often through independent sales representatives, sold PHARMACY A large quantities of oxycodone and hydrocodone, which were illegally distributed and dispensed and sold on the black market.

24. Crew leaders and runners, including **LEWIS** and others, paid individuals to pose as patients in exchange for their obtaining prescriptions for controlled substances at CLINICA, authorized by **ROBLES**, and for filling those prescriptions at Houston-area pharmacies, including PHARMACY A.

25. **LEWIS** and other crew leaders, runners, and purported patients paid CLINICA cash in exchange for prescriptions for oxycodone, hydrocodone, carisoprodol, and other drugs that **ROBLES**, Person 1, and **LEWIS** knew were, and intended to be, issued without a legitimate medical purpose outside the usual course of professional practice. CLINICA employees were directed to charge different amounts for purported appointments depending on the drug or drugs

the crew leaders, runners, and purported patients sought—approximately $300 for hydrocodone and carisoprodol, and approximately $400 or more for oxycodone.

26. CLINICA employees tracked the daily receipts, tallying how much each customer (including purported patients, crew leaders, and runners) paid, and which crew leaders brought which purported patients to CLINICA.

27. **LEWIS**, although not a formal CLINICA employee, served as gatekeeper for crew leaders, runners, and purported patients brought to CLINICA to receive illegitimate prescriptions.

28. Often, **ROBLES** did not see or examine the purported patients to whom he prescribed oxycodone, hydrocodone, or carisoprodol. Instead, non-physician individuals usually conducted perfunctory encounters with purported patients, after which **ROBLES** prescribed the controlled substances. Such non-physician individuals were not licensed to practice medicine in Texas. When he did see patients, **ROBLES** often did not conduct a medical examination.

29. **ROBLES** knew such prescriptions were unauthorized, and that they were issued without a legitimate medical purpose outside the usual course of professional practice.

30. After **ROBLES** issued prescriptions for hydrocodone, oxycodone, and carisoprodol, CLINICA employes directed purported patients to fill those prescriptions at PHARMACY A and other Houston-area pharmacies.

31. **LEWIS** and other crew leaders and runners obtained these unlawful prescriptions from **ROBLES**, had them filled at complicit pharmacies, including PHARMACY A, and sold the pills on the black market.

32. From in or around July 2017 through in or around September 2021, **ROBLES** issued prescriptions for the following drugs, among others, in the following amounts:

| Controlled Substance | Approximate Number of Prescriptions | Approximate Number of Pills |
|---|---|---|
| Oxycodone 30 mg | 12,734 | 1,341,541 |
| Hydrocodone 10-325 mg | 27,863 | 2,957,056 |
| Carisoprodol 350 mg | 19,090 | 1,130,643 |

33. From in or around January 2017 through in or around September 2021, PHARMACY A dispensed prescriptions for the following drugs, among others, prescribed by **ROBLES** in the following amounts:

| Controlled Substance | Approximate Number of Prescriptions | Approximate Number of Pills |
|---|---|---|
| Oxycodone 30 mg | 8,684 | 805,625 |
| Hydrocodone 10-325 mg | 3,091 | 254,894 |
| Carisoprodol 350 mg | 731 | 40,858 |

34. From in or around January 2019 through in or around August 2021, cash deposits into bank accounts controlled by **ROBLES** totaled over $2,000,000.

35. From in or around January 2019 through in or around July 2021, cash deposits into PHARMACY A's accounts totaled over $400,000.

All in violation of Title 21, United States Code, Section 846.

**<u>COUNT 2</u>**
**Unlawful Distribution and Dispensing Controlled Substances**
**(21 U.S.C. § 841 and 18 U.S.C. § 2)**

36. Paragraphs 1 through 13 and 16 through 35 of the Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

37. On or about the date specified below, in the Houston Division of the Southern District of Texas and elsewhere, Defendant

**JAMES ROBLES, M.D.**,

aiding and abetting, and aided and abetted by, others known and unknown to the Grand Jury, did knowingly and intentionally distribute a controlled substance, that is distributing the controlled substances alleged below, knowing and intending that such distribution and dispensing was unauthorized:

| Count | Controlled Substances | Approximate Date | Pills | Purported Patient |
|---|---|---|---|---|
| 2 | Hydrocodone 10-325mg<br>Carisoprodol 350mg | April 14, 2021 | 120 pills<br>30 pills | D.F. |

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and Title 18, United States Code, Section 2.

**COUNT 3**
**Maintaining a Drug Involved Premises**
**(21 U.S.C. § 856(a)(1) and 856(b), and 18 U.S.C. § 2)**

38. Paragraphs 1 through 13 and 16 through 35 of the Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

39. From no later than July 2017 through in or around October 2021, in the Houston Division of the Southern District of Texas and elsewhere, Defendant

**JAMES ROBLES, M.D.**,

did knowingly rent, use, or maintain 12000 Bellaire Blvd, Suite 160, Houston, Texas, for the purpose of distributing controlled substances, specifically oxycodone, hydrocodone, and carisoprodol.

In violation of Title 21, United States Code, Sections 856(a)(1) and 856(b), and Title 18, United States Code, Section 2.

**NOTICE OF CRIMINAL FORFEITURE**
**(21 U.S.C. § 853(a))**

40. Pursuant to Title 21, United States Code, Section 853(a), 841, 846, and 856 the United States of America gives notice to Defendants

**JAMES ROBLES, M.D.,**
**RONALD LEWIS**

that upon conviction of an offense in violation of Title 21, United States Code, Sections 841, 846, and 856 the following is subject to forfeiture:

a. all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of such a violation;

b. all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such violation.

The property to be forfeited includes but is not limited to the following:

a. Approximately $18,986.62 seized from Bank of America *8097 on or about October 20, 2021; and

b. Approximately $41,583.73 seized from Lone Star National Bank *7498 on or about October 20, 2021.

**Money Judgment and Substitute Assets**

41. The United States will seek the imposition of a money judgment against the Defendants upon conviction.

42. Defendants are notified that in the event that one or more conditions listed in Title 21, United States Code, Section 835(p) exists, the United States will seek to forfeit any other property of the Defendants up to the amount of the money judgment as to the Defendants.

A TRUE BILL

Original signature on file

FOREPERSON

AARON F. REITZ
UNITED STATES ATTORNEY

COLIN M. MCDONALD
ASSISTANT ATTORNEY GENERAL
NATIONAL FRAUD ENFORCEMENT DIVISION

*Angela J. Benoit*

ANGELA J. BENOIT
TRIAL ATTORNEY
HEALTH CARE FRAUD SECTION
NATIONAL FRAUD ENFORCEMENT DIVISION
U.S. DEPARTMENT OF JUSTICE